IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2024

IN RE ZAIDYN B. ET AL.

Appeal from the Juvenile Court for Coffee County
No. 2022-JV-488          Gerald Ewell, Jr., Judge
_____

No. M2023-01095-COA-R3-PT
_____

In this case involving termination of the father's parental rights to his children, the trial court found that six statutory grounds for termination had been proven by clear and convincing evidence. The trial court further found that clear and convincing evidence demonstrated that termination of the father's parental rights was in the children's best interest. The father has appealed. Upon thorough review, we affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY ARMSTRONG, JJ., joined.

Matthew S. Bailey, Sparta, Tennessee, for the appellant, James B.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural History

On December 9, 2022, the Tennessee Department of Children's Services ("DCS") filed, in the Coffee County Juvenile Court ("trial court"), a petition seeking to terminate the parental rights ("the Termination Petition") of the parents, James B. ("Father") and Brittany B. ("Mother") to their children, Zaidyn B. and Emilee B. (collectively, "the

Children").[1]  DCS averred that the Children had been in foster care since they had been adjudicated dependent and neglected by the trial court in January 2022 following the issuance of an emergency protective custody order in January 2021.  DCS further averred that there had been a "prior custodial episode" in November 2020, during which time it had been reported that there was "drug use in the home" and that Father had been "driving under the influence with the children in the car with no car seats."

As grounds for termination, DCS alleged that Father had abandoned the Children by (1) failing to visit or support them during the relevant statutory four-month period, (2) failing to provide a suitable home for them, (3) exhibiting a wanton disregard for their welfare, (4) failing to substantially comply with the requirements of the permanency plans created by DCS, and (5) failing to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.  In addition, DCS alleged that the conditions that had led to the Children's removal from Father's custody persisted.  DCS further asserted that termination of Father's parental rights was in the Children's best interest.  As the litigation progressed, the trial court appointed a guardian *ad litem* for the Children and counsel for Father in January 2023.

The record demonstrates that previously, in September 2020, Father had gained sole custody of the Children after the trial court ordered that Mother could have no contact with them due to her alleged abuse of one of their older siblings.  However, on November 25, 2020, the trial court placed the Children into temporary DCS custody due to Father's failure to assume physical custody of the Children, the conditions of Father's home, Father's placement of the Children in the care of individuals who did not have legal authority to care for them, and Father's threats to "abscond" with the Children were he to lose custody.  Custody was restored to Father on December 10, 2020, after the trial court determined that although Father was "without a home" at the time of the hearing, he had placed the Children with "appropriate care givers . . . being his older son and his girlfriend."  On December 4, 2020, Father was arrested on theft and drug charges following an incident wherein police apprehended Father and another man while they were "loading a 4-wheeler ATV into a truck."  Father had brought then five-year-old Zaidyn with him.  The police found "meth and a pipe in a nearby cooler" at Father's feet.  Father was incarcerated between December 4, 2020, and January 23, 2021.  While Father was in jail, DCS moved for modification of custody, but the trial court denied the motion, determining that the Children's placement in the home of Father's son and his girlfriend had previously been adjudicated a suitable home.

---

[1] Mother had previously been arrested on September 2, 2020, and the Children had been removed from her custody at that time and placed in Father's custody.  Although Mother is named as an appellant in this matter and the trial court terminated Mother's parental rights in the same order in which it terminated Father's parental rights, Mother has not filed a brief or otherwise participated in the instant appeal.  Therefore, we will confine our analysis to the issues raised in Father's brief.

However, on January 11, 2021, upon subsequent motion filed by DCS, the trial court again placed the Children in DCS protective custody after adjudicating them "dependent and neglected as defined in TCA 37-1-102(b)(13)" due to, *inter alia*, "neglect, anger issues, and domestic violence in the home" where the Children had been residing with Father's adult son. The Children remained in state custody continuously thereafter. On February 17, 2021, DCS created the first permanency plan to reunite Father with the Children ("First Permanency Plan"). That plan was ratified by order of the trial court on April 27, 2021, pursuant to Tennessee Code Annotated § 37-2-403(A)(C). The trial court conducted a permanency hearing in January 2022 and determined that Father was not in compliance with the First Permanency Plan. DCS subsequently created a second permanency plan in September 2022 ("Second Permanency Plan"), which included requirements similar to those in the First Permanency Plan.[2] The trial court conducted a permanency hearing relative to the Second Permanency Plan in January 2023 and again determined that while DCS had made reasonable efforts toward the goals of the Second Permanency Plan, Father was not in substantial compliance with the plan.

Meanwhile, Father's criminal problems continued. On March 15, 2021, Father was arrested for public intoxication and resisting arrest, and on June 16, 2021, Father was arrested for driving under the influence and driving on a revoked or suspended license. In January and February 2022, Father served ten days in jail after he was arrested pursuant to an attachment for failure to pay child support based on an order wherein the trial court had instructed him to pay $50.00 per month for each of the Children. Father paid $800.00 in child support as his bond for release but did not make any further child support payments after that time. On May 2, 2022, Father was arrested and subsequently charged with joyriding and theft of property. Consequently, Father was incarcerated from September 17, 2022, to January 25, 2023, on theft charges. In May 2023, Father was again incarcerated for failure to pay child support for the Children and remained in jail during the trial on the Termination Petition.

On June 21, 2023, the trial court conducted a bench trial, during which the court heard testimony from Father; DCS Foster Service Worker Amy Batts; Zaidyn's foster parents, C.P. and B.P.; and Emilee's foster parents, M.H. and J.H. Prior to the beginning of testimony, DCS withdrew the ground of abandonment by failure to visit, and Father raised lack of willfulness as an affirmative defense to the ground of failure to provide financial support. Following the trial, the trial court entered an order on July 21, 2023, terminating Father's parental rights to the Children based upon a finding that DCS had proven, by clear and convincing evidence, each of the six statutory grounds presented at

---

[2] A third permanency plan was ratified by the trial court in March 2023, after DCS filed the Termination Petition, but the trial court determined that the plan was not relevant because by the time it was ratified, DCS's goal for the Children was adoption, not reunification with Father. No issue has been raised on appeal concerning this finding.

trial. The trial court also determined that termination of Father's parental rights was in the Children's best interest. Father timely appealed.

## II. Issues Presented

Father presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred by finding that statutory grounds existed to terminate Father's parental rights to the Children.

2. Whether the trial court erred by finding that termination of Father's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and

consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2022, to current)[3] lists the statutory requirements for termination of parental rights, providing in relevant part:

---

[3] Unless otherwise noted, throughout this Opinion all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Termination Petition was filed, and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at \*4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the children.

In its final order, the trial court found that clear and convincing evidence supported the following grounds for termination of Father's parental rights: (1) abandonment by failure to financially support the Children, (2) abandonment by exhibiting a wanton disregard for the Children's welfare prior to Father's incarceration, (3) abandonment by failure to provide a suitable home for the Children, (4) substantial noncompliance with the permanency plans, (5) persistence of the conditions leading to the Children's removal, and (6) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. We will address each respective ground in turn.

A. Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2022, to current), provides, in relevant part:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

instances, such as this one, the sub-section that was in effect at that time has not changed and therefore remains current.

6

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) (West July 1, 2022, to May 4, 2023) in effect when the Termination Petition was filed provided the following definitions of abandonment as pertinent to the first two grounds for termination in the instant case:

For purposes of terminating the . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:

(iv)     A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

(a)     Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;

* * *

(c)     With knowledge of the existence of the . . . child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

1. Abandonment by Failure to Support

The trial court determined, by clear and convincing evidence, that Father had abandoned the Children by failing to support them or make reasonable payments toward their financial support. In considering this ground, the trial court adopted the four-month period stipulated to by the parties: May 16, 2022, to September 16, 2022 ("Determinative Period"). The Termination Petition was filed on December 9, 2022, and Father had been incarcerated beginning on September 17, 2022, within the four months immediately preceding the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a) (when a parent is incarcerated during all or part of the four consecutive months immediately preceding the filing of a termination petition, the relevant time period for consideration

7

regarding abandonment by failure to support is the "four (4) consecutive months immediately preceding the parent's or guardian's incarceration.").

In the final order, the trial court made the following specific findings of fact regarding abandonment by failure to support:

[Father] testified that the only support he paid was February 10th, 2022, and was paid only so that he would be released from jail. The payment date was verified by Exhibit 13. Although [Father] first testified that he "did not know he was supposed to pay child support," he later conceded that he was aware of the Order of May 21st, 2021 (Exhibit 12), which required him to pay $50 per month per child as child support. [Father's] knowledge of his obligation to pay child support was confirmed by [his] signature which appears on exhibit 16, the Criteria for Termination of Parental Rights dated October 15th, 2021. This document includes a warning that failure to pay child support could result in termination of his parental rights. In addition, he was jailed for nonpayment of child support in February 2022 which was prior to the determination period. His claim he did not know he was required to pay child support is preposterous.

In that [Father] made no payments of child support except to get out of jail, the Court finds that is evidence of his willful failure to support. . . . At one point in his testimony [Father] somewhat volunteered "I'm not lazy, I make money if I need it." At another point, in [Father's] testimony about the amount of child support he exclaimed "fifty dollars a month, that ain't much" or words to that effect.

[Father] testified that he was currently incarcerated due to a child support attachment and has been incarcerated since June 9th, 2023. He was awaiting a hearing . . . expecting the negotiation of a "purge" payment [to] obtain his release. Regarding his ability to get out of jail, he testified, "I could probably do it (pay the purge payment) right now, but I don't want to bother anybody. I want to use the money for other things."

The Court finds by clear and convincing evidence that [Father] willfully failed to support these children during the [Determinative Period]. He was clearly aware of his obligation to support the children due to his signature on the Notice of October 15th, 2021, was making $400-$500 per week during the [Determinative Period], described himself as "not lazy, I make money when I need it," and described the amount of child support ordered as "that ain't much." If there was any doubt of willfulness, [Father's] failure to make any payments of child support after the single payment of $800 on February 22nd, 2022, necessary to obtain his release from jail up to

8

the date of the hearing, as well as his statement "I could pay it now . . . but I want to use the money for other things" makes it abundantly clear that the only time [Father] intends or intended to pay support is when payment is required to get himself out of jail.

Father raised lack of willfulness as an affirmative defense at trial. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure."). The parent or guardian "shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence." *Id.* This Court has previously explained "willfulness" in the context of parental termination actions as follows:

Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child . . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted); *see In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

In his appellate brief, Father contends that his failure to provide support for the Children was not "willful" because he did not know he was ordered to pay child support "during the time he was making $500-$600 a week" and because the child support orders mentioned by the trial court in its final order were not known to him because they were "default judgments." Father avers that after he had made "two $400 child support payments on February 10, 2022, which got him out of jail, it was rough finding a job." Father also asserts that he did not have sufficient transportation to work after he was released from jail. Father's position is that while "he may have had the ability to pay child

9

support prior to going to jail," his lack of payment during the Determinative Period was not willful "given his lack of transportation and difficulty finding work after leaving jail."

Father's argument that he was unaware of his obligation to pay child support prior to his incarceration is unavailing. It is well settled in Tennessee that a parent maintains an obligation to provide child support and is taxed with knowledge of that obligation even in the absence of a court order or request from the other parent. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); *State Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004) ("In Tennessee . . . the obligation to pay [child] support exists even in the absence of a court order to do so.") (citation omitted). Thus, whether the trial court's child support orders were "default" judgments has no bearing on Father's obligation or knowledge of his obligation to pay child support because such knowledge was imputed to Father regardless of whether an order to pay child support existed in the first instance. Moreover, the record reflects that Father was indeed aware that he was required to pay child support during the Determinative Period because he was arrested in January 2022 for failing to pay child support and purged his obligation in February 2022, several months before the Determinative Period began. Furthermore, Father conceded that he had been aware he owed $50.00 per month in child support for each of the Children during the Determinative Period.

Concerning Father's position that he was unable to pay child support during the Determinative Period, Father admitted at trial that prior to his September 2022 incarceration, he was working "off and on" and making an "average" of "$500, $600 a week" during that time. Father further testified, albeit unclearly as to when it occurred, that he once "brought home $2,500 in one day." Moreover, he was able to tender $800.00 in a lump sum to meet his bond requirement to be released from jail in February 2022. Significantly, Father, who was again incarcerated for failure to pay child support at the time of the termination trial, explained that he could have purged his financial obligation for the Children during this second incarceration but chose not to because he "need[ed] the money for other things." By reason of the above, we conclude that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Father had willfully abandoned the Children for failure to provide financial support.

2. Abandonment by Exhibiting a Wanton Disregard for the Children's Welfare

With reference to this ground for termination, this Court has previously explained:

Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A

10

parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. Taxonomy of Children's Rights, 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S*., 182 S.W.3d at 866 (footnote omitted). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id*. at 867-68.

Concerning this ground, the trial court analyzed Father's "repeated incarceration, criminal behavior, substance abuse, and failure to provide adequate support or supervision" for the Children during the time period spanning from September 2020 until July 2023, with reference to the *Audrey* factors and to the relevant time period as discussed in *In re Braylin T*., No. M2022-01256-COA-R3-PT, 2023 WL 2584446, at *5 (Tenn. Ct. App. March 21, 2023) ("Parental conduct which exhibits a wanton disregard for a child's welfare is not limited to the four-month period immediately preceding incarceration and may occur at *any* time prior to incarceration.") (citation omitted).

The trial court first considered the factors of repeated incarceration and criminal behavior by making specific references to exhibits entered into evidence during the termination trial. The trial court delineated that Father had been (1) incarcerated from December 4, 2020, until January 23, 2021, and from March 15, 2021, until April 7, 2021; (2) "arrested for driving under the influence June 16, 2021"; (3) "issued a criminal summons November 14th, 2021, for assault with bodily injury"; (4) "arrested on a child support attachment" on January 28, 2022; and (5) incarcerated until February 10, 2022, when he was released upon payment of "$800 ($400 per child) to obtain his release." Regarding substance abuse, the court found that "[Father] admitted to substance abuse, testifying that he had 'done a lot of things,' including using methamphetamine up to nine (9) months before trial, and was convicted of DUI as a result of the incident of June 16th, 2021." Relative to consideration of whether Father failed to provide adequate support, the trial court found:

11

[Father] made one payment of child support only to obtain his release from jail despite his own testimony that he "can make money when I need it." He abdicated responsibility to care for these children to his adult son during the period September 2020 to December 4th, 2020.

The trial court addressed Father's failure to properly supervise the Children as follows:

In his testimony, [Father] never mentioned any effort on his part to provide a place for the children to live. . . . [Father's] serial incarceration after the children's removal prevented him from having the ability to care for the children. He did not testify to any efforts he made to regain custody of his children during the four months after removal, even during the periods he was not incarcerated.

The trial court focused the balance of its analysis on Father's actions leading to his arrest and incarceration on December 4, 2020. The trial court recounted that according to Father's own testimony and exhibits entered into evidence at the termination trial, Father had, without a driver's license, "loaded up" then five-year-old Zaidyn into his truck along with another adult "who had been drinking whiskey" "to go load up a 4-wheeler neither owned," "during which time a package of methamphetamine was found where [Father] was standing [and] resulted in him being incarcerated."

Upon careful review, we determine that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Father had abandoned the Children by exhibiting wanton disregard for the Children's welfare prior to his incarceration. There was ample proof presented at trial, much stemming from Father's own testimony and the multiple arrest warrants entered into evidence as exhibits, regarding Father's arrests and incarcerations for various criminal activities. A number of Father's arrests were proven to have involved substance abuse, such as his arrests for public intoxication, driving under the influence, and possession of methamphetamine. Finally, the evidence supported the trial court's determination that Father had been unwilling to provide suitable supervision or financial support for the Children, as evinced by his failure to pay child support, lack of stable housing, and apparent general disinterest in the Children's well-being. Accordingly, we affirm the trial court's findings and conclusions as to this ground.

### 3. Abandonment by Failure to Establish a Suitable Home

Father appeals from the trial court's finding by clear and convincing evidence that he had abandoned the Children by failing to establish a suitable home for them. Concerning this ground, the version of Tennessee Code Annotated § 36-1-102 (1)(A)(ii) (West July 1,

2022, to May 4, 2023) in effect at the time of the petition's filing provided that a parent can be found to have abandoned a child when

(ii)(a)    The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b)    The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c)    For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

In determining that clear and convincing evidence supported this statutory ground, the trial court examined the proof and concluded that each statutory criterion had been met. The trial court specifically found that the Children had been removed from Father's custody and placed with DCS by court order on January 11, 2021. Respecting section (b), the trial court determined that DCS had engaged in reasonable efforts to prevent removal but was unable to do so because Father was incarcerated at the time of removal. The trial court further determined that DCS had made reasonable efforts to keep the Children with members of their family by first placing the Children with their older brother, Father's adult son, and his girlfriend.

13

Referencing section (c), the trial court determined that DCS had made reasonable efforts to assist Father in establishing a suitable home for the Children by offering to help Father with "deposits, rent, and utilities" and attempting to place the Children with other family. By contrast, Father "never mentioned any effort on his part to provide a place for the children to live" and "did not dispute that [DCS] offered the rent and utility assistance[,]" or that DCS had attempted to place the Children with family members. The trial court determined that the "only testimony [Father] offered as to any contribution that he made which might be related to providing a place for these children to live was that he 'may have paid four months rent' (for the lot on which his son's trailer was located) 'after his son died.'" The trial court noted that Father's son had died in September 2022, well over four months following the Children's removal in January 2021.

On appeal, Father does not dispute any of the proof relied upon by the trial court as to this ground. Instead, Father asserts that he "has previously made payments for a residence, helping his daughter-in-law get caught up in rent[.]" Regarding the Children, Father focuses not on the period between the Children's removal in January 2021 and the termination trial but instead on events occurring after the trial was completed and on potential future events. For example, Father posits that he is "going to do good in the future," that he now "has a home," and that while he "may have been at jail at the time of trial," he anticipated being released the next Wednesday." Father offers that he is "willing to do whatever it takes to keep his [C]hildren" and that he has taken responsibility for his actions such that he "could provide a suitable home for the [C]hildren at an early date."

Unfortunately, Father's expressions of intent toward working to provide a suitable home for the Children going forward are "too little, too late." *See In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *7 (Tenn. Ct. App. Aug. 31, 2015) (holding that a mother's act in obtaining housing only "two weeks before the final trial date in the termination proceeding" was "too little, too late."); *see also In re Daymien T*., 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016) (concluding that the father's "progress on the requirements of the permanency plan after the filing of the termination petition" was "too little, too late" considering the father had failed to take any action for nearly two years after the child had been removed from his custody) (internal citations omitted). Moreover, the record supports the trial court's findings in all respects. Specifically, the record establishes that the Children were removed from Father's custody on January 11, 2021, and placed in DCS custody. Father was incarcerated at that time. In the protective custody order, the trial court determined that DCS had employed reasonable efforts to prevent the Children from being placed into DCS custody but that these efforts proved unavailing because no relative or alternative custodian could be located. The Children were adjudicated dependent and neglected by order entered on January 21, 2022, and according to that order, this determination was stipulated to by both parents. During the termination trial, Ms. Batts, who was Father's DCS case worker for most of 2021, testified that Father had failed to obtain "safe and stable housing" and a "stable daily routine." She further explained that there were not any family members to care for the Children when they were removed from

14

Father's custody, that DCS had informed Father that the department was willing to help Father with "deposits and rent" for obtaining housing, and that Father had not attempted to obtain stable housing. Furthermore, Father had not complied with the requirements of the permanency plans implemented since the Children were taken from him in January 2021.

Because Father's interest in providing a suitable home for the Children was "too little, too late" and because the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father had abandoned the Children by failing to provide them a suitable home, as provided in § 36-1-102(1)(A)(ii), we affirm the trial court's findings and conclusions concerning this ground.

### B. Substantial Noncompliance with Permanency Plans

Tennessee Code Annotated § 36-1-113(g)(2) provides an additional ground for termination of parental rights as follows:

> There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]

The trial court found by clear and convincing evidence that Father had failed to substantially comply with the requirements of two permanency plans created by DCS to facilitate restoration of the Children's custody to Father: the first developed by DCS on February 17, 2021, and ratified by the trial court on April 26, 2021, and the second entered on February 7, 2022. Under the permanency plans, Father was required to, *inter alia*, (1) pay child support, (2) avoid incurring any new criminal charges, (3) refrain from associating with individuals who were actively under the influence or using or selling drugs, (4) participate in counseling to address domestic violence issues, (5) submit to mental health evaluation/psychological testing and alcohol and drug assessment, (6) acquire safe and stable housing and demonstrate stability in order to parent the Children appropriately and effectively, (7) participate in parenting education and establish a routine, and (8) develop a "bonded" relationship with the Children and a visitation plan that would include a minimum of two visits with the Children per month. The trial court addressed each of these action steps and found that Father had failed to substantially comply with the requirements. The trial court observed that the only aspect of the plan with which Father "attempted to comply" was the requirement that he arrange regular visits with the Children.

Upon our review, the evidence preponderates in favor of the trial court's determination, by clear and convincing evidence, that Father failed to substantially comply with the responsibilities outlined in the permanency plans. Regarding compliance with the First Permanency Plan, the trial court conducted a permanency hearing in January 2022, after which the court entered an order determining that DCS had been "making reasonable efforts toward finalizing the permanency goals" (reunification with the Children's parents)

15

but that Father had "not taken responsibility of cooperating and/or communicating with [DCS]." Specifically, the trial court found that Father did not have housing or a legal source of income and had not completed his alcohol and drug assessment or mental health assessment as required. At the permanency hearing on the Second Permanency Plan, the trial court determined that Father was not in substantial compliance with the Second Permanency Plan "in that he [had] done nothing."

Father asserts on appeal that while he "still ha[d] things to complete on the permanency plan . . . the State failed to prove that he [was] in substantial noncompliance." Father avers that although he was "behind" on paying child support, he had paid "eight months' worth of payments for each child" when he tendered $800.00 in child support to gain release from jail. He continues that his criminal activity had ceased and that he had not used methamphetamine for nine months as of the termination trial. Father directs attention to his testimony that he "did some parenting classes," that he "had addressed his alcohol and drug issues," and that he "went to Centerstone" (a mental health facility recommended by DCS that conducts alcohol and drug assessments) "trying to get help."

Regarding Father's child support obligation, we have analyzed the issue and determined above that Father's failure to financially support the Children was willful and that DCS had proven the statutory ground by clear and convincing evidence. The same analysis and conclusion apply here in the context of Father's financial obligations to the Children pursuant to the permanency plans. Regarding Father's criminal activity, the record demonstrates that Father had been arrested during the period the permanency plans were in place for multiple criminal violations, including, *inter alia*, theft of property; joyriding; public intoxication; resisting arrest; driving under the influence; driving on a suspended license; unlawful drug paraphernalia, use, and activity; and assault resulting in bodily injury. While we commend Father's expressed attempts to improve his life by refraining from criminal activity in the months preceding trial, we note that Father's abstinence from criminal activity was occasioned by his own incarceration and not from any apparent intentional change of behavior on his part.

Regarding Father's averment that he "did some parenting classes," the record does not support this assertion. When questioned at trial if Father had participated in parenting education, Ms. Batts responded in the negative. Father presented no documentation demonstrating that he had ever attended parenting classes. When Father was asked about attending parenting classes, Father responded:

I tried to do some of those, because those one classes that—the parenting classes or whatever, you would have to meet somewhere else; then it would be somewhere else. And then it would get—then I had went to jail. It was just get all confused up. I couldn't get nothing in line, because everything kept going back and forth, and I was trying to deal with those

16

charges and trying to do all that. So I couldn't keep nothing in line. But now, I mean, I've got all that behind me. Now I could go somewhat forward.

From this testimony, it appears that Father may have attempted to schedule appointments for parenting classes, but there is no evidence that he actually enrolled or participated in them.

The same appears to be true relative to Father's contention that he sought mental health assistance and participated in programs at Centerstone. Ms. Batts testified that Father had not taken medication as prescribed and had not provided documentation to DCS that he had undergone a mental health evaluation. When pressed whether he had addressed his mental health as required in the permanency plans, Father responded that he had "seen the guy," but he could not provide specifics or documentation containing names of mental health care professionals, times and dates of visits, or whether he had received a mental health assessment as required by the permanency plans.

Finally, although Father urges on appeal that he went to Centerstone for classes and treatment in compliance with the permanency plans, Father indicated that he went to Centerstone approximately a month before trial, long after the termination petition had been filed and the trial court had determined Father to be in substantial noncompliance with the permanency plans. In addition, Ms. Batts explained that she had called Centerstone and Father "had not been a client there." For the above-stated reasons, we find that the trial court did not err in finding, by clear and convincing evidence, that Father was in substantial noncompliance with the permanency plans and that this was an established ground for terminating his parental rights to the Children.

### C. Persistence of Conditions Leading to the Children's Removal

The trial court determined that the statutory ground of persistence of the conditions leading to removal of the Children from Father's custody had been proven by clear and convincing evidence. Relative to this statutory ground, the version of Tennessee Code Annotated § 36-1-113(g)(3) (West July 1, 2022, to May 4, 2023) in effect at the time of the Termination Petition's filing provided for termination of parental rights when

(A)     [t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable

17

probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

The trial court summarized its factual findings concerning this ground as follows:

[Father's] continued criminal behavior, lack of any legal entitlement to live at any location and continued drug use will lead to further neglect or abuse of the children.  Based upon the attitude and testimony of [Father], the Court finds he has no interest in adjusting his activities to accommodate the demands of parenting and thus there is no chance the conditions that led to removal [of the Children from his custody] will be remedied so that the children can be returned safely to [Father's] custody.

The Court finds by clear and convincing evidence that continuation of the parent/child relationship eliminates the possibility these children would ever have [a] safe, stable, and permanent home.

[Father] simply has no interest in a safe, stable, or permanent home for himself and the proof is evident he is unwilling to sacrifice his desires to parent or provide for his children.

Upon review, we determine that a preponderance of the evidence supports the trial court's findings by clear and convincing evidence as to this statutory ground.

Concerning the focus of this statutory ground, this Court has recently explained:

The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." [*In re Audrey S.*, 182 S.W.3d,] 874 [(Tenn. Ct. App. 2005)].  The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment

18

for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

*In re Kaisona B.*, No. W2020-01308-COA-R3-PT, 2021 WL 4319624, at *6 (Tenn. Ct. App. Sept. 23, 2021). "Under this [persistence of conditions] ground, a parent's inability to eliminate such conditions does not need to be willful." *In re Braden K.*, No. M2020-00569-COA-R3-PT, 2020 WL 5823344, at *9 (Tenn. Ct. App. Sept. 30, 2020) (citing *In re Dakota C.R.,* 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012)).

By the time of trial, the Children had been in protective custody for over twenty-nine months, far longer than the statutory six-month minimum. As established through our review of the evidence respecting the statutory grounds of abandonment and substantial noncompliance with the permanency plans, the conditions that led to the Children's removal—including Father's willful failure to pay child support, his ongoing criminal activity, his repeated incarceration, and his lack of stable housing—persisted. The trial court also found that Father had failed to show any interest in completing the necessary parenting classes and mental health and substance abuse assessments to improve his relationship with the Children and regain custody of them.

The evidence also supports a determination that continuation of the parent-child relationship would greatly diminish the Children's chances of integration into a safe, stable, and permanent home, particularly considering Father's failure to support the Children financially, his lack of interest in cooperating with DCS, his failure to visit the Children regularly despite encouragement from DCS to do so, and his failure to secure stable housing. The evidence further supports a determination that the Children are flourishing and have forged relational bonds with their respective foster families, who have expressed an interest in adoption. We therefore agree that clear and convincing evidence established this statutory ground for termination.

### D. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Children

The trial court found, by clear and convincing evidence, that Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (West July 1, 2022, to current) provides:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial

19

responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Children and (2) returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

After considering the proof as to this ground, the trial court concluded:

[Father] cannot or will not control his desires or sacrifice any of his desires to provide anything for his children. He prefers to have no stable home, work only when he needs money, use drugs, fight with people, take things that do not belong to him (the 4-wheeler theft conviction and the joyriding conviction) and stay in jail so he can spend his money on other things rather than pay his back-child support which would get him out of jail.

The evidence in the record supports the trial court's findings and conclusions. Specifically, the record establishes that the Children were adjudicated dependent and neglected and placed into protective custody on January 11, 2021. They remained with their foster families continuously thereafter. We reiterate that documents proffered during trial evinced that two permanency plans were developed and ratified during the ensuing months, with Father failing to substantially comply with either plan. After the Children were removed from his custody in January 2021, Father was incarcerated twice for failure to pay child support. He admitted that during the second such incarceration, he possessed the money to purge his responsibility but chose not to do so. During this time, Father never cultivated a stable home and instead was repeatedly arrested and incarcerated for various criminal activities, including theft, drug use, and assault. Based upon our thorough review of the record, we determine that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Children.

In further support of this statutory ground, DCS was also required to prove that returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *See In re Neveah M.*, 614 S.W.3d at 674, 677. This Court has previously observed:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to

20

precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). In consideration of the "substantial harm" prong relative to this ground, the trial court concluded:

> Placing these children in their Father's custody would undoubtedly lead to them being 1.) homeless 2.) exposed to drug use and 3.) exposed to criminal behavior. This would pose a risk of substantial harm to both the physical and psychological welfare of the children.

Upon review, we agree. The evidence established that Father did not possess stable housing at any time during the proceedings and maintained a history of domestic violence, criminal activity, and drug use in the presence of the Children.

By contrast to Father's disinterest in taking responsibility for the well-being of the Children, the trial court considered testimony from the Children's foster parents, all of whom expressed that the Children were thriving in their respective foster homes. For example, C.P., Zaidyn's foster mother, articulated that Zaidyn had "made leaps and bounds" in improvement to his social life, school, and sports activities since coming to live with the family sixteen months before the trial, and that he was receiving "straight A's" and was actively involved in "after-school clubs" and church activities. She also indicated that the bond was so strong between Zaidyn and his foster parents that he called them "Mom and Dad." C.P. and her husband also expressed an interest and willingness to adopt Zaidyn. Similarly, M.H., foster mother to Emilee, testified that during the fifteen months since Emilee had come to reside with the family, she had "made a lot of progress" in school, enjoyed a good relationship with the other children in the family, had been participating in weekly therapy sessions, and referred to the foster parents as "Mama and Daddy." M.H. and her husband added that they wished to adopt Emilee.

Although the trial court did not specifically reference the positive foster home environments and the effect these would have on the physical and psychological welfare of the Children as relative to this ground, this Court has previously acknowledged that removing children from foster families with whom they have bonded over time "would pose a risk of substantial harm to the physical or psychological welfare of the [child]." *See In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *12 (Tenn. Ct. App.

21

Apr. 11, 2016) (quoting *State v. C.H.H.*, No. E2001-021-7-COA-R3-CV, 2002, WL 1021667, at *8-*9, (Tenn. Ct. App. May 21, 2002)).

Based upon the evidence, particularly noting the contrast between Father's demonstrated lack of assuming the responsibilities necessary to regain custody of the Children on one hand and the Children's foster parents' extent of care and desire to adopt the Children on the other, we agree with the trial court's findings. We conclude that the evidence does not preponderate against the court's finding that DCS had proven this statutory ground by clear and convincing evidence. We therefore affirm the trial court's reliance in its termination order on the ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.

## V. Best Interest of the Children

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2022, to current) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

23

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861).

24

"After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final order, the trial court considered each of the twenty best interest factors and determined that most of them weighed in favor of termination of Father's parental rights. Upon our thorough review of the evidence, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

Concerning factor (A), relative to the Children's "critical need for stability and continuity of placement," the court determined that this factor weighed heavily in favor of

termination because Father had "no place with a legally enforceable right to live and exhibits no interest in acquiring same." Father counters that he testified as to raising two other children to adulthood with no trouble from DCS and for that reason this factor should not weigh against him. However, Father's ability to parent other children without DCS involvement is marginally relevant to the effect termination of his parental rights will have on the Children in the instant case. Moreover, at the time of trial, Father was incarcerated and did not possess stable housing. Father never enjoyed a stable home during the pendency of the proceedings. The home that he did provide for the Children—that of his adult son—had proven volatile such that the court removed the Children from that residence and placed them into protective custody. The foster parents stressed that the Children had integrated well into their families. They also voiced their interest in adopting the Children. For these reasons, we agree with the trial court that the evidence preponderates in favor of termination as to this factor. For the same reasons, we determine that the evidence preponderates in favor of termination as to factor (B), which relates to the effect a "change of caretakers and physical environment" would have on the Children's overall well-being.

Regarding factor (C), the trial court focused on the proof that the Children's respective foster families had made positive efforts to ensure their education. By contrast, the trial court noted that there was no proof of any "academic participation" on the part of Father. The trial court also found that Father had exhibited a "lack of effort" regarding housing and that Father's continuing criminal activity—including possession of methamphetamine and arrests for "DUI, assault and resisting arrest," compelled the court to conclude that Father's "idea of safety for his children or ability to keep them safe is nonexistent." Accordingly, the trial court determined that this factor weighed in favor of termination of Father's parental rights. Upon review, we find that the evidence preponderates in favor of the trial court's findings regarding Father's lack of stability, continuity, or concern for the Children's educational, housing, and safety needs. In addition, the proof regarding Father's failure to provide financial support demonstrates Father's lack of continuity and stability in meeting the Children's material needs.

As to factor (D), the trial court determined that there was no evidence offered respecting the existence of any attachment between Father and the Children and that it did not appear that Father desired a "parental attachment." Regarding the related factor (E), whether the parent has maintained regular visitation or other contact with the child to cultivate a positive relationship with the child, Ms. Batts testified regarding a visit between Father and the Children at the DCS offices in November 2021. Ms. Batts stated that Father had telephoned the DCS office twice in early 2022 but that she was unable to reach Father when she returned his call. These contacts between Father and DCS notwithstanding, we agree with the trial court that even had Father contacted DCS to arrange visits with the Children, these attempts were not sufficient to outweigh Father's apparent indifference to visiting the Children overall. The trial court noted that the phone calls from Father were made "almost a year before the [Termination Petition] was filed" and that there was no

proof that Father made any further attempts. Accordingly, we conclude that both factors (D) and (E) weigh in favor of termination of Father's parental rights.

The trial court determined that there was a dearth of proof presented regarding factors (F) and (G), which relate to a child's fear or trauma concerning the parent or the parent's home. We agree with the trial court that nothing in the record supports a finding in favor of termination relative to these two factors; therefore, we determine that they weigh against termination. *See In re Cartier H*., No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) (determining that a factor in the best interest analysis that is "not proven to weigh in favor of termination . . . weighs against termination.").

Regarding Factor (H)—whether the child has created a healthy parental attachment with another person or persons in the absence of the parent—the trial court found that this factor weighed heavily in favor of termination because both Children had integrated well into their foster families, with both enjoying time with their foster siblings and participating in specific enjoyable activities with their foster parents. Testimony from the foster parents, as well as numerous photographs entered as exhibits at trial, established that the Children were engaged in and enjoying many activities with their foster families, including celebrating holidays, working on projects at home, attending school and community functions, and traveling. The evidence preponderates in favor of the trial court's findings as to factor (H).

The trial court determined that factor (I) weighed in favor of termination as well. The trial court reiterated that proof of the positive relationships between the Children and their foster families was significant. Regarding the Children's "heritage" and their relationship to one another and their other biological siblings, the trial court determined that information and connection with those family members "would be easily available should the [C]hildren desire same" because the Children had been placed in foster homes that were "close" in proximity, about "5 minutes down the road" from one another. Upon our review, the evidence preponderates in favor of the trial court's findings as to this factor. Although there was testimony that the Children had lost contact with one another and with their biological siblings, and although this is certainly a loss of connection to their biological heritage, there was no evidence presented to suggest that Father—were he to maintain his parental rights respecting the Children—would possess either the ability or the desire to facilitate the Children's reunion with each other or their other siblings. On the contrary, Father had shown little effort in visiting with the Children and no interest in fostering any connection between them and their other siblings, except to give temporary custody of them to his adult son who had since died of a fentanyl overdose. There was no further proof regarding either Father's or Mother's other family members. This factor weighs in favor of terminating Father's parental rights.

27

The trial court determined that factor (J) weighed "strongly" in favor of termination, finding that Father had made no adjustments in his circumstances, conduct, or conditions to benefit the Children. Instead, Father had increased his criminal activity after the Children were removed from his custody, had not paid child support, had established no suitable home, and had "no interest in any sacrifice on his part to provide care for them." The trial court likewise found that factors (K) and (L) weighed in favor of termination because Father had not availed himself of any of the offered assistance from DCS and because DCS's efforts to assist Father in regaining custody were greater than Father's efforts. Upon review, the evidence preponderates in favor of the trial court's determinations regarding factors (J), (K), and (L). We reiterate that the proof was substantial that Father did not support the Children financially except to pay child support to gain release from jail, did not possess a stable home, was frequently arrested for criminal activity before and after the Children were removed from his custody, and was incarcerated before and during the trial. Ms. Batts testified that after the Children were removed from Father's custody, she made Father aware that DCS could "help with deposits and rent" on housing. She further reported that DCS never restricted Father's ability to arrange visitation with the Children and instead attempted to facilitate such visitation. Furthermore, DCS created two permanency plans to assist Father in regaining custody of the Children, the requirements of which Father entirely ignored.

Regarding factor (M), the trial court noted that Father's "parentage was never questioned." However, the trial court appears to have weighed this factor in favor of termination because the court again mentioned Father's lack of efforts in seeking custody of the Children or amending the conditions and circumstances leading to their removal. Instead, the trial court reiterated, Father's "criminal activity and incarceration actually increased after removal." For the same reasons discussed above relative to factor (J), we determine that the evidence preponderates in favor of the trial court's findings as to factor (M).

Concerning factor (N), the trial court found as follows:

> This case began as a case against [the Children's Mother] as a result of brutality against an older sibling. There was an insinuation in [Father's] testimony that they lived together when this incident occurred, however no direct proof. The Court cannot say that [Father] was responsible for any of the "abuse" identified in factor "N," certainly no proof of any acts of commission of that type.

> There is a degree of physical and emotional neglect by [Father] in essentially dropping out of these children's lives, first by having them live with his adult son and then, eventually, just ignoring them after they went into DCS custody. Most of this behavior is better considered under other

factors. The Court puts no weight under this subsection (N) beyond consideration of [Father's] behavior under other subsections.

Although the trial court determined that factor (N) was neutral, having found no evidence of "abuse" as contemplated by that factor, we find this factor does weigh in favor of termination to the extent that the factor contemplates "neglect" by a parent toward a child. As the trial court correctly found, Father exhibited neglect toward the Children when he failed to assume physical custody of them. Father's neglect continued with his criminal activity—including drug use and theft in the presence of Zaidyn—while the Children were in his care. This behavior was especially neglectful considering that Father maintained sole custody of the Children following the September 2020 restraining order entered against Mother.

Regarding factor (O), whether the parent has ever provided safe and stable care for the child, the trial court determined that no proof was offered as to this factor. Upon review, we find it telling that there is no evidence in the record pointing to any time when Father provided safe and stable care for the Children, yet the record is replete with examples of Father's _failure_ to provide same. For this reason, we find this factor weighs in favor of termination. As to factor (P), there is no evidence in the record that Father ever demonstrated any concern for either of the Children's specific needs or personality. The trial court again noted that Father's "repeated incarceration, lack of a home, [and] unconcern about either" child demonstrated a lack of understanding and willingness to provide the "basic and specific needs" of the Children. We determine, after reviewing all of the evidence, that factor (P) weighs in favor of termination for the same reasons we have determined that factors (C), (E), (J), (K), and (M) weigh in favor of termination.

Regarding factor (Q), whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and wherein the child can thrive, the trial court determined this factor weighed strongly in favor of termination. Here, the trial court focused on Father's "spirited and animated" testimony regarding an altercation that resulted in Father's arrest for assault. The trial court noted that Father "seemed quite proud of vindicating his honor." Moreover, the trial court contrasted Father's heightened interest in this encounter against Father's apparent disinterest in the well-being of his Children. The trial court further concluded that Father's "serial incarceration" and drug use rendered him incapable of providing a suitable home for the Children. We agree with the trial court. Just as we concluded that the evidence supported the trial court's conclusion that Father had abandoned the Children by failure to provide them with a suitable home, we determine that this factor weighs in favor of termination.

The trial court determined that both factors (R) and (S)—relative to the physical environment of a parent's home and parent's history of providing financial support—weighed in favor of termination. Upon careful review of the evidence, we agree, for the

reasons articulated above. Regarding factor (T), relative to Father's mental and emotional fitness to provide safe and stable care and supervision of the Children, there was little proof presented regarding Father's mental and emotional state. The trial court recounted Father's criminal acts, recent drug use, and "demonstrated enthusiasm to avoid responsibility and stability" in determining that this factor weighed strongly in favor of termination. Upon review, the proof supports the trial court's determination. We particularly consider Father's failure to seek help from services like Centerstone, his use of methamphetamines nine months prior to the trial, his serial incarceration, and his unwillingness to complete even one requirement from either permanency plan as indicative that this factor should weigh in favor of termination.

Considering the entirety of the applicable factors, we conclude that the evidence weighs soundly in favor of terminating Father's parental rights to the Children. In the more than two years following the Children's removal, Father demonstrated little urgency in seeking avenues to regain custody of the Children or to provide a suitable home for them. Father's efforts to accomplish the requirements of the permanency plans were nonexistent. Father willfully refused to provide financial support for the Children and continued his lifestyle of criminal activity, drug use, and serial incarceration after the Children were removed from his care such that Father generally failed to demonstrate that he possessed the ability or interest to adequately care for the Children. We therefore affirm the trial court's finding by clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Children and collection of costs assessed below. Costs on appeal are assessed to the appellant, James B.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE